**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KEVIN MALONE, Individually and On Behalf of All Others Similarly Situated, | Case No.: |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| OMEGA PROTEIN CORPORATION, BRET D. SCHOLTES, and ANDREW C. JOHANNESEN, | |
| Defendants. | **JURY TRIAL DEMANDED** |

Plaintiff Kevin Malone ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Omega Protein Corporation, ("Omega" or the "Company"), with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Omega; and (c) review of other publicly available information concerning Omega.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that acquired Omega's securities between June 4, 2013, and March 1, 2017, inclusive (the "Class Period"), against the Defendants,[1] seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Omega is a nutritional products company that purportedly develops, produces, and delivers products to improve the nutritional integrity of foods, dietary supplements, and animal feeds.

3.      On March 1, 2017, the Company disclosed that in December 2016, it received a subpoena from the SEC requesting information in connection with an investigation relating to a Company subsidiary's compliance with its probation terms and the Company's protection of whistleblower employees.  The Company also disclosed that the investigation could result in a material adverse effect on the Company's business, reputation, results of operation, and financial condition.

4.      On this news, the price of Omega common stock fell $6.25 per share, or 23.8%, to close at $20.00 per share on March 2, 2017, on unusually heavy trading volume.

5.      Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business,

---

[1] "Defendants" refers to Omega Protein Corporation, Bret D. Scholtes, and Andrew C. Johannesen, collectively.

operations, and prospects. Specifically, Defendants failed to disclose: (1) that Omega's subsidiary was potentially not in compliance with its probation terms; (2) that the Company was not properly protecting whistleblower employees; (3) that, as a result of the foregoing, the Company was vulnerable to an SEC investigation and potential civil and criminal liability; and (4) that, as a result of the foregoing, Defendants' statements about Omega's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

6.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

9.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  In addition, the Company's shares are actively traded in this Judicial District.

10.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

11.     Plaintiff Kevin Malone, as set forth in the accompanying certification, incorporated by reference herein, purchased Omega common stock during the Class Period, and

suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

12.    Defendant Omega Protein Corporation is incorporated in Nevada and its headquarters are in Houston, Texas.  Omega's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "OME."

13.    Defendant Bret D. Scholtes ("Scholtes") was the President, Chief Executive Officer ("CEO"), and a Director of Omega at all relevant times.

14.    Defendant Andrew C. Johannesen ("Johannesen") was the Executive Vice President and Chief Financial Officer ("CFO") of Omega at all relevant times.

15.    Defendants Scholtes and Johannesen (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Omega's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

16.    Omega is a nutritional products company that purportedly develops, produces, and delivers products to improve the nutritional integrity of foods, dietary supplements, and animal feeds.

**Materially False and Misleading**
**Statements Issued During the Class Period**

17.    The Class Period begins on June 4, 2013.  On that day, the Company issued a press release entitled "Omega Protein Subsidiary Reaches Agreement To Resolve Previously Disclosed Coast Guard and EPA Investigation."  Therein, the Company, in relevant part, stated:

HOUSTON, June 4, 2013 /PRNewswire/ -- Omega Protein Corporation (NYSE: OME), a nutritional product company and a leading integrated producer of omega-3 fish oils and specialty protein products, today announced that its subsidiary, Omega Protein, Inc., has reached an agreement with the United States Attorney's Office for the Eastern District of Virginia that resolves a pending U.S. Coast Guard and Environmental Protection Agency ("EPA") investigation related to its Reedville, Virginia fishing vessels and operations.

(Logo:  http://photos.prnewswire.com/prnh/20120717/NE41641LOGO)

As previously disclosed, in April 2010, the Company received a request for information from the EPA concerning its subsidiary's bail wastewater practices used in fishing operations at its Reedville facility. Also as previously disclosed, in February 2011, the U.S. Coast Guard conducted inspections at the Reedville facility regarding the Reedville vessels' bilge water discharge practices. Omega Protein's subsidiary's agreement with the U.S. Attorney's Office resolves both issues.

Pursuant to terms of the agreement, Omega Protein's subsidiary has pleaded guilty to two Clean Water Act violations. The plea agreement requires Omega Protein's subsidiary to pay a $5.5 million fine, be placed on a three year term of probation, and implement an environmental compliance program. In addition to the $5.5 million fine, the subsidiary will be required to make a $2 million payment to the National Fish and Wildlife Foundation to fund projects in Virginia related to the protection of the environmental health of the Chesapeake Bay. The plea agreement has been approved by the U.S. District Court for the Eastern District of Virginia.

"Omega Protein, Inc. is committed to ensuring that we operate in compliance with federal and state environmental requirements. The Company has expended significant resources to strengthen its environmental compliance systems across its operations." said Bret Scholtes, the Company's Chief Executive Officer. "We are committed to being a responsible corporate citizen and protecting the ocean waters upon which we all rely."

18.    On March 10, 2014, the Company issued a press release entitled "Omega Protein Announces Fourth Quarter and Full Year 2013 Financial Results."  Therein, the Company, in relevant part, stated:

**Fourth Quarter and Full Year 2013 Highlights**

- **Revenues:**  $66.0 million for the quarter and $244.3 million for the year
- **Gross profit margin:**  42.4% for the quarter and 33.9% for the year
- **Net income:** $9.7 million, or $14.2 million excluding plant closure charges and net gain on disposal of assets, for the quarter, and $30.5 million, or $35.0 million excluding plant closure charges and net loss on disposal of assets, for the year
- **Earnings:**  Earnings per diluted share of $0.45, or $0.66 excluding plant closure charges and net gain on disposal, for the quarter, and $1.45, or $1.66 excluding plant closure charges and net loss on disposal,  for the year
- **Adjusted EBITDA:** $26.7 million for the quarter and $75.6 million for the year

"We are pleased with the progress made on our strategic objectives in 2013, as we continued to build a more balanced nutrition company focused on value-added products that allow families to live healthier lives through nutrition.  Our strong financial performance during the year included increased revenues, as well as record gross profit and gross margin," commented Bret  Scholtes, Omega Protein's President and Chief Executive Officer.  "In the quarter, our financial results benefited from record human nutrition revenue, attractive animal nutrition forward contract pricing, and a productive end to the 2013 fishing season."

Mr. Scholtes concluded, "We are excited to build on this progress in 2014 as we introduce additional capacity and capabilities to capitalize on our market opportunities."

**Fourth Quarter 2013 Results**

The Company's revenues increased 4% from $63.1 million in the same period last year to $66.0 million.  This increase was due to a $4.4 million increase in human nutrition revenue, partially offset by a $1.6 million decrease in animal nutrition revenues.  The increase in human nutrition revenues was primarily due to sales of protein products from Wisconsin Specialty Protein ("WSP"), a business acquired by the Company in the first quarter of 2013.  The decrease in animal nutrition revenues was primarily due to a 33% decrease in the Company's fish meal sales volumes, partially offset by a 109% increase in fish oil sales volumes and increased sales prices of 19% and 15% for the Company's fish meal and fish oil, respectively.  The composition of revenue by nutritional product line for the fourth quarter of 2013 was 59% fish meal, 26% fish oil, 14% specialty nutraceutical and food ingredients and products, and 1% fish solubles and other.

Fourth quarter of 2013 revenues decreased 25% from $87.6 million in the third quarter of 2013 to $66.0 million.  This decrease was due to a $23.2 million decrease in animal nutrition revenues, which reflected decreased sales volumes of 19% and 53% for fish meal and fish oil, respectively, and a 5% decrease in fish meal sales prices, partially offset by a 30% increase in fish oil

sales prices.  The increase in fish oil sales prices was primarily due to a change in the product mix of higher priced refined and lower priced crude oils, and higher prices on those crude oil volumes.  Human nutrition revenues increased $1.6 million to $9.4 million in the fourth quarter compared to $7.8 million in the third quarter.  The increase in human nutrition revenues primarily reflects higher sales of OmegaActiv fish oil and other nutraceutical ingredients.

The Company reported gross profit of $28.0 million, or 42.4% as a percentage of revenues, for the fourth quarter of 2013, versus $12.9 million, or 20.5% as a percentage of revenues, in the fourth quarter of 2012.  The increase was due to an increase in the animal nutrition segment gross profit as a percentage of revenues from 20.1% to 47.1% as a result of increased fish oil and fish meal sales prices and greater than anticipated fish catch in the fourth quarter.  As a result of this greater fish catch and production, standard cost for 2013 inventory, for which sales commenced largely in the third quarter of 2013, was decreased and all previous sales of 2013 inventory production were adjusted during the fourth quarter ended December 31, 2013. This increase in gross profit as a percentage of revenues was partially offset by a decrease in the human nutrition segment gross profit as a percentage of revenues from 24.9% to 13.6%, due primarily to lower gross profit as a percentage of revenues for other nutraceuticals and the addition of the protein products business.

Compared to the third quarter of 2013, fourth quarter gross profit decreased from $29.4 million to $28.0 million; however, gross profit as a percentage of revenues increased from 33.6% to 42.4%.  The increase in gross profit as a percentage of revenues was due to an increase in animal nutrition gross profit as a percentage of revenues from 34.5% to 47.1% primarily as a result of the lower inventory cost associated with greater than anticipated fish catch after September 30, 2013, as discussed above.  The human nutrition segment gross profit as a percentage of revenues decreased from 24.6% to 13.6% primarily due to lower gross profit as a percentage of revenues for protein products and changes in product mix.

Selling, general and administrative expenses for the fourth quarter increased $0.5 million to $5.9 million compared to the fourth quarter of 2012, primarily as a result of the WSP acquisition.  Selling, general and administrative expenses decreased from $6.9 million for the third quarter of 2013, primarily as a result of decreased employee compensation related costs.

In the fourth quarter of 2013, the Company closed its menhaden fish processing plant located in Cameron, Louisiana and re-deployed certain vessels from that facility to the Company's other Gulf Coast facilities located in Abbeville, Louisiana and Moss Point, Mississippi, as previously announced.  In conjunction with the closure, the Company incurred charges of $6.6 million in the fourth quarter of 2013.

The fourth quarter of 2013 effective tax rate was 31.9% compared to 126.2% in the fourth quarter of 2012 and 34.6% in the third quarter of 2013. The higher

effective tax rate in the fourth quarter of 2012 was primarily the result of charges relating to a U.S. Attorney investigation that were non-deductible for tax purposes.

Net income for the fourth quarter of 2013 was $9.7 million ($0.45 per diluted share) compared to a net loss of $0.5 million ($0.03 loss per diluted share) for the same period last year and net income of $14.0 million ($0.66 per diluted share) for the third quarter of 2013. Excluding plant closure charges and net gain on disposal of assets, net income for the fourth quarter of 2013 would have been $14.2 million ($0.66 per diluted share) and excluding the impact of the charges related to the U.S. Attorney investigation and net loss on disposal of certain assets, net income for the fourth quarter of 2012 would have been $4.0 million ($0.20 per diluted share).

Adjusted EBITDA totaled $26.7 million for the fourth quarter of 2013, compared to $11.6 million for the same period last year and $27.1 million for the third quarter of 2013.

**Full Year 2013 Results**

Revenues for the year ended December 31, 2013 increased 4% to $244.3 million compared to revenues of $235.6 million for the year ended December 31, 2012. The increase in revenues for 2013 was due to a $9.1 million increase in human nutrition revenues partially offset by a $0.4 million decrease in animal nutrition revenues. The increase in human nutrition revenues was due primarily to the acquisition of WSP in the first quarter of 2013. The decrease in animal nutrition revenues was primarily due to decreased sales volumes of 28% for the Company's fish meal, partially offset by increased sales prices of 23% for the Company's fish meal and increased sales volumes and prices of 2% and 43%, respectively, for the Company's fish oil.

The Company reported record gross profit of $82.8 million, or 33.9% as a percentage of revenues, for the year ended December 31, 2013, versus gross profit of $42.1 million, or 17.8% as a percentage of revenues, for the year ended December 31, 2012. The increase in gross profit as a percentage of revenues was primarily due to an increase in animal nutrition segment gross profit as a percentage of revenues from 17.3% to 36.2%, reflecting an increase in animal segment revenues per unit as a result of higher fish meal and fish oil sales prices, partially offset by a decrease in human nutrition gross profit as a percentage of revenues from 22.8% to 18.2%.

Net income for the year ended December 31, 2013 was $30.5 million ($1.45 per diluted share) compared to $4.1 million ($0.20 per diluted share) for the same period last year. Excluding plant closure charges and net loss on disposal of assets, net income for 2013 would have been $35.0 million ($1.66 per diluted share) and excluding the impact of U.S. Attorney investigation charges and net gain on disposal of assets, net income for the year ended December 31, 2012 would have been $10.4 million ($0.52 per diluted share).

Adjusted EBITDA totaled $75.6 million for the year ended December 31, 2013, an increase from $35.6 million for the previous year.

**Balance Sheet**

The Company's balance sheet remains strong, and stockholders' equity increased $41.6 million to $247.2 million as of December 31, 2013 as compared to $205.6 million at December 31, 2012. Total debt decreased $3.1 million from December 31, 2012 to $24.2 million on December 31, 2013. The Company's December 31, 2013 cash balance decreased $21.9 million from December 31, 2012 to $34.1 million. This decrease was primarily due to the acquisition of WSP in the first quarter of 2013, as well as expenditures related to 2013 fishing season, capital spending and debt payments, and was partially offset by the sale of inventory.

19.     On the same day, March 10, 2014, the Company filed its annual report on form 10-K with the SEC.  The 10-K was signed by Defendant Johannesen, and reaffirmed the Company's financial results announced in the press release issued on the same day.  The 10-K also stated, in relevant part:

> **If our Omega Protein subsidiary fails to comply with the terms of its probation under a plea agreement entered into in June 2013, we could be subject to criminal prosecution.** In June 2013, Omega Protein, the Company's principal subsidiary, entered into a plea agreement with the United States Attorney's Office for the Eastern District of Virginia to resolve the previously disclosed government investigation related to its Reedville, Virginia fishing vessels and operations.  Consistent with the terms of the plea agreement, the subsidiary pled guilty in the United States District Court for the Eastern District of Virginia to two felony counts under the Clean Water Act, paid a fine of $5.5 million, and made a $2.0 million contribution to an environmental fund.
>
> The plea agreement and the terms of the court's sentencing order require Omega Protein to develop and implement an environmental compliance program at all of its facilities, and also imposed a three year period of probation.  The Company has implemented a comprehensive compliance program which covers the areas addressed by the plea agreement. The U.S. Probation Office, in consultation with the U.S. Attorney's Office for the Eastern District of Virginia and the Environmental Protection Agency, as necessary, have the right to monitor our compliance with these requirements during the term of probation.
>
> In the event that Omega Protein does not comply with the terms of the plea agreement and the court's sentencing order, including the terms of probation, Omega Protein could be subject to additional criminal penalties or prosecution (including for the matters covered and resolved by the plea agreement).  In addition, if Omega Protein fails to maintain compliance with the Clean Water Act

or other similar environmental regulatory requirements in the future, Omega Protein could become subject to additional criminal or civil liability in connection with any such non-compliance. Omega Protein could also experience increased compliance costs, or alterations to the conduct of its normal course operations, in connection with these matters. Any of the foregoing could result in a material adverse effect on the Company's business, reputation, results of operation and financial condition.

In addition, the convictions under the Clean Water Act will adversely affect the Company's ability to secure government contracts with the United States, and possibly secure future loans under the NFMS Title XI loan program. The subsidiary has received notice from the EPA that it is ineligible, as a result of the convictions under the Clean Water Act, for receipt of government contracts or benefits if any part of the work will be performed at the facility where the offense occurred.

20.    On March 11, 2015, the Company issued a press release entitled "Omega Protein Announces Fourth Quarter and Full Year 2014 Financial Results." Therein, the Company, in relevant part, stated:

**Fourth Quarter and Full Year 2014 Highlights**

- **Revenues:** $102.5 million for the quarter and $308.6 million for the year
- **Gross profit margin:** 22.0% for the quarter and 25.1% for the year
- **Net income:** $3.2 million, or $7.8 million on an adjusted basis for the quarter and $18.5 million, or $29.9 million on an adjusted basis for the year
- **Earnings per diluted share:** $0.14, or $0.35 on an adjusted basis for the quarter and $0.85, or $1.37 on an adjusted basis for the year
- **Adjusted EBITDA:** $19.7 million for the quarter and $70.1 million for the year

"The fourth quarter of 2014 concluded a successful year for Omega Protein, both in terms of consolidated financial results and progress towards achieving our strategic objectives. While we faced headwinds in certain aspects of our business, the Company managed to generate its second highest annual gross profit and adjusted EBITDA," commented Bret Scholtes, Omega Protein's President and Chief Executive Officer. "As we enter 2015, we are focused on the integration of Bioriginal and making strategic investments to support the growth of our more diversified human nutrition platform. We believe that we are better positioned than ever before to capitalize on the positive fundamentals in the specialty protein and oil sectors of the animal and human nutrition markets to increase profitability and enhance shareholder value long-term."

**Fourth Quarter 2014 Results**

The Company's revenues increased 55% from $66.0 million in the same period

last year to $102.5 million.  This increase was due to growth in animal nutrition revenues of $11.5 million and human nutrition revenues of $25.0 million. The increase in animal nutrition revenues was primarily due to higher fish oil and fish meal volumes of 34% and 17%, respectively, as well as higher fish meal sales prices of 3%, partially offset by 9% lower fish oil sales prices. The increase in human nutrition revenues was primarily attributable to the acquisition of Bioriginal Food & Science Corp. ("Bioriginal"), which was acquired on September 5, 2014. The composition of revenues by nutritional product line for the fourth quarter of 2014 was 45% fish meal, 21% fish oil, 33% dietary supplements and food, and 1% fish solubles and other.

Fourth quarter of 2014 revenues increased 45% from $70.8 million in the third quarter of 2014 to $102.5 million.  This increase was due to growth in animal nutrition revenues of $13.0 million and human nutrition revenues of $18.7 million. The increase in animal nutrition revenues was primarily due to higher fish meal and fish oil volumes of 31% and 6%, respectively, as well as higher fish meal and fish oil sales prices of 2% and 4%, respectively. The increase in human nutrition revenues was primarily due to the acquisition of Bioriginal.

The Company reported gross profit of $22.5 million, or 22.0% as a percentage of revenues, for the fourth quarter of 2014, versus $28.0 million, or 42.4% as a percentage of revenues, in the fourth quarter of 2013. The decrease in gross profit as a percentage of revenues was due to reductions in both the animal and human nutrition segments.  Animal segment gross profit as a percentage of revenues declined from 47.1% to 28.7%, due primarily to a higher cost per unit for current season production and greater than anticipated fish catch in the fourth quarter of 2013, which resulted in additional profit related to prior period sales.  Human nutrition gross profit as a percentage of revenues decreased from 13.6% to 8.6% due primarily to lower gross profit as a percentage of revenues for protein products.

Compared to the third quarter of 2014, fourth quarter gross profit increased from $14.2 million, or 20.0% as a percentage of revenues, to $22.5 million, or 22.0% as a percentage of revenues.  Animal nutrition gross profit as a percentage of revenues increased from 25.8% to 28.7% as a result of increased fish oil and fish meal sales prices.  Human nutrition segment gross profit as a percentage of revenues increased from a gross loss of 0.1% to a gross profit of 8.6% due primarily to the acquisition of Bioriginal.

Selling, general and administrative expenses for the fourth quarter increased $2.8 million to $8.7 million compared to the fourth quarter of 2013, primarily as a result of the Bioriginal acquisition.  Selling, general and administrative expenses decreased $1.5 million from $10.2 million in the third quarter of 2014 due primarily to non-recurring professional expenses related to the third quarter acquisition of Bioriginal.

Impairment of goodwill and other intangible assets increased from $0.2 million in the fourth quarter of 2013 to $4.7 million in the fourth quarter of 2014 due to

impairment expenses related to the InCon and Cyvex reporting unit within the human nutrition segment.

In the fourth quarter of 2013, the Company closed its menhaden fish processing plant located in Cameron, Louisiana and re-deployed certain vessels from that facility to the Company's other Gulf Coast facilities. In conjunction with the closure, the Company incurred charges of $1.6 million and $6.6 million in the fourth quarters of 2014 and 2013, respectively.

The fourth quarter of 2014 effective tax rate was 46.5% compared to 31.9% in the fourth quarter of 2013 and 60.6% in the third quarter of 2014. The fourth quarter of 2014 effective tax rate reflected the impact of bonus depreciation rules enacted during the quarter, and the third quarter of 2014 effective tax rate reflected non-deductible expenses related to the acquisition of Bioriginal.

Net income for the fourth quarter of 2014 was $3.2 million ($0.14 per diluted share) compared to $9.7 million ($0.45 per diluted share) in the same period last year and $0.7 million ($0.03 per diluted share) for the third quarter of 2014. Excluding plant closure charges, impairment expenses, acquisition related costs and net gain or loss on disposal of assets, net income for the fourth quarter of 2014 would have been $7.8 million ($0.35 per diluted share), compared to $14.3 million ($0.67 per diluted share) in the same period last year and $4.8 million ($0.22 per diluted share) for the third quarter of 2014.

Adjusted EBITDA totaled $19.7 million for the fourth quarter of 2014, compared to $26.7 million for the same period last year and $13.1 million for the third quarter of 2014.

**Full Year 2014 Results**

Revenues in the twelve months ended December 31, 2014 increased 26% to $308.6 million compared to revenues of $244.3 million for the twelve months ended December 31, 2013. The increase in revenues was due to a $30.6 million increase in animal nutrition revenues and a $33.8 million increase in human nutrition revenues. The increase in animal nutrition related revenues was primarily due to increased sales volumes of 46% and 1% for the Company's fish oil and fish meal, respectively, and increased sales prices of 2% for the Company's fish meal, partially offset by decreased sales prices of 4% for the Company's fish oil. The increase in human nutrition revenues was due primarily to the acquisition of Bioriginal.

The Company recorded gross profit of $77.6 million, or 25.1% as a percentage of revenues, in 2014, versus gross profit of $82.8 million, or 33.9% as a percentage of revenues, in 2013. The decrease in gross profit as a percentage of revenues was primarily due to a decrease in animal nutrition segment gross profit as a percentage of revenues from 36.2% to 29.8%, reflecting the impact of decreased fish oil yields and slower than anticipated early season fish catch on cost per unit of sales. In addition, human nutrition gross profit as a percentage of revenues

decreased from 18.2% to 7.7% due primarily to lower gross profit as a percentage of revenues for protein products and the addition of Bioriginal including its one time acquisition-related inventory write-up to fair value.

The effective tax rate was 38.9% for the twelve months ended December 31, 2014 compared to 33.6% for the twelve months ended December 31, 2013. The effective tax rate in 2014 would have been approximately 36.2% were it not for non-deductible expenses related to the acquisition of Bioriginal.

Net income for the twelve months ended December 31, 2014 was $18.5 million ($0.85 per diluted share) compared to $30.5 million ($1.45 per diluted share) last year. Excluding plant closure charges, impairment expenses, acquisition related costs and net gain or loss on disposal of assets, net income for the twelve months ended December 31, 2014 would have been $29.9 million ($1.37 per diluted share) compared to $35.8 million ($1.70 per diluted share) for the year ended December 31, 2013.

Adjusted EBITDA totaled $70.1 million for twelve months ended December 31, 2014, a decrease from $76.6 million for the previous year.

**Balance Sheet**

Due in large part to the Bioriginal acquisition, the Company's December 31, 2014 cash balance decreased $32.6 million from December 31, 2013 to $1.4 million, and total debt increased $11.0 million from December 31, 2013 to $35.2 million on December 31, 2014. Stockholders' equity increased $18.7 million to $265.9 million as of December 31, 2014 compared to $247.2 million as of December 31, 2013.

21.     On the same day, March 11, 2015, the Company filed its annual report on form 10-K with the SEC.  The 10-K was signed by Defendant Johannesen, and reaffirmed the Company's financial results announced in the press release issued on the same day.  The 10-K also stated, in relevant part:

**If our Omega Protein subsidiary fails to comply with the terms of its probation under a plea agreement entered into in June 2013, we could be subject to criminal prosecution.** In June 2013, Omega Protein, the Company's principal subsidiary, entered into a plea agreement with the United States Attorney's Office for the Eastern District of Virginia to resolve the previously disclosed government investigation related to the fishing vessels and operations of its Reedville, Virginia facility.  Consistent with the terms of the plea agreement, the subsidiary pled guilty in the United States District Court for the Eastern District of Virginia to two felony counts under the Clean Water Act, paid a fine of $5.5 million, and made a $2.0 million contribution to an environmental fund.

The plea agreement and the terms of the court's sentencing order require Omega

Protein to develop and implement an environmental compliance program at all of its facilities, and also imposed a three year period of probation.  The Company has implemented a comprehensive compliance program which covers the areas addressed by the plea agreement. The U.S. Probation Office, in consultation with the U.S. Attorney's Office for the Eastern District of Virginia and the Environmental Protection Agency, as necessary, have the right to monitor our compliance with these requirements during the term of probation.

In the event that Omega Protein does not comply with the terms of the plea agreement and the court's sentencing order, including the terms of probation, Omega Protein could be subject to additional criminal penalties or prosecution (including for the matters covered and resolved by the plea agreement).  In addition, if Omega Protein fails to maintain compliance with the Clean Water Act or other similar environmental regulatory requirements in the future, Omega Protein could become subject to additional criminal or civil liability in connection with any such non-compliance.  Omega Protein could also experience increased compliance costs, or alterations to the conduct of its normal course operations, in connection with these matters.  Any of the foregoing could result in a material adverse effect on the Company's business, reputation, results of operation and financial condition.

In addition, the convictions under the Clean Water Act will adversely affect the Company's ability to secure government contracts with the United States, and secure future loans under the NFMS Title XI loan program in connection with the affected facility. The subsidiary has received notice from the EPA that it is ineligible, as a result of the convictions under the Clean Water Act, for receipt of government contracts, loans or benefits if any part of the work will be performed, or the loan collateral will be located, at the facility where the offense occurred.

22.    On March 9, 2016, the Company issued a press release entitled "Omega Protein Announces Fourth Quarter and Full Year 2015 Financial Results."  Therein, the Company, in relevant part, stated:

**Fourth Quarter and Full Year 2015 Highlights**

- **Revenues:**  $82.3 million for the quarter and $359.3 million for the year
- **Gross profit margin:**  28.0% for the quarter and 27.5% for the year
- **Net income:** $2.9 million, or $6.5 million on an adjusted basis, for the quarter and $24.0 million, or $33.4 million on an adjusted basis, for the year
- **Earnings per diluted share:** $0.13, or $0.29 on an adjusted basis, for the quarter and $1.07, or $1.50 on an adjusted basis, for the year
- **Adjusted EBITDA:**  $18.9 million for the quarter and $79.6 million for the year

"2015 was a transformational year for Omega Protein as our financial results, including a record Adjusted EBITDA, reflect contributions from a robust fish

harvest, continued strong demand for our products, efficient operational performance and the Bioriginal acquisition," commented Bret Scholtes, Omega Protein's President and Chief Executive Officer. "We continue to take strategic actions to build on these accomplishments and better position our business for future growth. These efforts include our plan to invest an additional $18 million of growth capital to further improve the efficiency of our animal nutrition business, and our decision to refocus our human fish oil business by exiting concentrated oils manufacturing. We remain confident about our opportunities to generate improved volumes and profitability, and in turn increase shareholder value in 2016."

**Fourth Quarter 2015 Results**

The Company's revenues decreased 20% from $102.5 million in the same period last year to $82.3 million. This decrease was due to decreases in animal nutrition and human nutrition revenues of $14.9 million and $5.3 million, respectively. The decrease in animal nutrition revenues was primarily due to decreased sales volumes of 74% and 2% for the Company's fish oil and fish meal, respectively, and decreased fish meal sales prices of 3%, partially offset by 36% higher fish oil sales prices. The increase in fish oil sales prices was primarily due to a change in the product mix of higher priced refined and lower priced crude oils, as well as higher prices on each. The decrease in human nutrition revenues was largely due to decreased sales of specialty oils. The composition of revenues by nutritional product line for the fourth quarter of 2015 was 54% fish meal, 35% dietary supplements, 9% fish oil, and 2% fish solubles and other.

Fourth quarter of 2015 revenues decreased 27% from $112.2 million in the third quarter of 2015 to $82.3 million. This decrease was due to a $19.9 million decrease in animal nutrition revenues and a $10.0 million decrease in human nutrition revenues. The decrease in animal nutrition revenues was primarily due to lower fish oil and fish meal volumes of 76% and 6%, respectively, and lower fish meal sales prices of 3%, partially offset by 40% higher fish oil sales prices. The decrease in human nutrition revenues was largely due to decreased sales of specialty oils.

The Company reported gross profit of $23.1 million, or 28.0% as a percentage of revenues, for the fourth quarter of 2015, versus $22.5 million, or 22.0% as a percentage of revenues, in the fourth quarter of 2014. The increase in gross profit as a percentage of revenues was due to an improvement in the animal nutrition segment, partially offset by lower human nutrition results. Animal nutrition gross profit as a percentage of revenues increased from 28.7% to 39.4%, due primarily to higher fish catch and production in 2015, which led to a decrease in the cost per unit of sales. Human nutrition gross profit as a percentage of revenues decreased from 8.6% to 7.2% due primarily to decreased gross profit as a percentage of revenues for menhaden omega-3 concentrates and tolling.

Compared to the third quarter of 2015, fourth quarter gross profit decreased from $35.2 million, or 31.4% as a percentage of revenues, to $23.1 million, or

28.0% as a percentage of revenues, due to a reduction in the human nutrition segment. Animal nutrition gross profit as a percentage of revenues increased slightly from 39.3% to 39.4%. Human nutrition gross profit as a percentage of revenues decreased from 16.6% to 7.2% due largely to decreased gross profit as a percentage of revenues for specialty oils, including menhaden omega-3 concentrates and tolling, and protein products.

Selling, general and administrative expense, including research and development expense ("SG&A"), for the fourth quarter increased $1.5 million to $10.8 million compared to the fourth quarter of 2014, primarily due to increases in labor and professional services expenses. SG&A decreased $1.6 million from $12.4 million in the third quarter of 2015, due to decreases in expenses related to labor and the human nutrition segment.

The Company recorded impairment and plant closure expenses of $5.3 million and $6.3 million in the fourth quarters of 2015 and 2014, respectively. The fourth quarter of 2015 expense is primarily due to the Company's decision to focus its omega-3 oils manufacturing operations on non-concentrated oils and dispose of its oil concentration facility.

Gain on foreign currency related to Bioriginal Food & Science ("Bioriginal") was $0.1 million for the fourth quarter of 2015 compared to loss on foreign currency of $0.8 million in the third quarter of 2015.

The fourth quarter of 2015 effective tax rate was 52.0% compared to 46.5% in the fourth quarter of 2014 and 33.6% in the third quarter of 2015. The increase from the third to fourth quarters of 2015 is due largely to the impact of a 2.7% increase in the year-to-date effective tax rate on earnings, as the tax expense impact of the higher rate on earnings from the first nine months of 2015 was recognized in the fourth quarter.

Net income for the fourth quarter of 2015 was $2.9 million ($0.13 per diluted share) compared to $3.2 million ($0.14 per diluted share) in the same period last year and $10.6 million ($0.47 per diluted share) in the third quarter of 2015. Excluding adjustments for certain items, adjusted net income for the fourth quarter of 2015 would have been $6.5 million ($0.29 per diluted share), compared to $7.8 million ($0.35 per diluted share) in the same period last year and $14.8 million ($0.66 per diluted share) for the third quarter of 2015.

Adjusted EBITDA totaled $18.9 million for the fourth quarter of 2015, compared to $19.7 million for the same period last year and $28.7 million for the third quarter of 2015.

**Full Year 2015 Results**

Revenues for the year ended December 31, 2015 increased 16% to $359.3 million compared to revenues of $308.6 million for the year ended December 31, 2014. The increase in revenues was due to a $74.3 million increase in human

nutrition revenues partially offset by a $23.7 million decrease in animal nutrition revenues. The increase in human nutrition revenues was primarily due to the acquisition of Bioriginal in September 2014. The decrease in animal nutrition revenues was primarily due to decreased sales volumes of 45% for the Company's fish oil, partially offset by increased sales prices of 24% and 3% for the Company's fish oil and fish meal, respectively.

The Company recorded gross profit of $98.9 million, or 27.5% as a percentage of revenues, for the year ended December 31 2015, versus gross profit of $77.6 million, or 25.1% as a percentage of revenues, for the prior year. The increase in gross profit as a percentage of revenues was due to improved results from both the animal and human nutrition segments, partially offset by a decrease in the proportion of revenues attributable to the animal nutrition segment. Animal segment gross profit as a percentage of revenues increased from 29.8% to 36.8%, and human nutrition gross profit as a percentage of revenues increased from 7.7% to 12.8%.

SG&A for the year ended December 31, 2015 increased $10.3 million to $44.1 million compared to the prior year, largely as a result of the Bioriginal acquisition.

The effective tax rate was 37.9% for the year ended December 31, 2015 compared to 38.9% in the prior year.

Net income for the year ended December 31, 2015 was $24.0 million ($1.07 per diluted share) compared to $18.5 million ($0.85 per diluted share) for the prior year. Excluding adjustments for certain items, adjusted net income for the year ended December 31, 2015 would have been $33.4 million ($1.50 per diluted share) compared to $29.9 million ($1.37 per diluted share) for the prior year. Adjusted EBITDA totaled $79.6 million for the year ended December 31, 2015, an increase from $70.1 million for last year.

**Balance Sheet**

Total debt decreased $11.1 million from $35.2 million on December 31, 2014 to $24.1 million on December 31, 2015. Stockholders' equity increased $29.3 million to $295.2 million as of December 31, 2015 compared to $265.9 million as of December 31, 2014.

23.    On the same day, March 9, 2016, the Company filed its annual report on form 10-K with the SEC. The 10-K was signed by Defendant Johannesen, and reaffirmed the Company's financial results announced in the press release issued on the same day. The 10-K also stated, in relevant part:

**If the Company's Omega Protein subsidiary fails to comply with the terms of its probation under a plea agreement entered into in June 2013, we could be**

**subject to criminal prosecution.** In June 2013, Omega Protein, the Company's principal subsidiary, entered into a plea agreement with the United States Attorney's Office for the Eastern District of Virginia to resolve the previously disclosed government investigation related to the fishing vessels and operations of its Reedville, Virginia facility. Consistent with the terms of the plea agreement, the subsidiary pled guilty in the United States District Court for the Eastern District of Virginia to two felony counts under the Clean Water Act, paid a fine of $5.5 million, and made a $2.0 million contribution to an environmental fund.

The plea agreement and the terms of the court's sentencing order require Omega Protein to develop and implement an environmental compliance program at all of its facilities, and also imposed a three year period of probation which will end in June 2016. The Company has implemented a comprehensive compliance program which covers the areas addressed by the plea agreement. The U.S. Probation Office, in consultation with the U.S. Attorney's Office for the Eastern District of Virginia and the E.P.A., as necessary, have the right to monitor the Company's compliance with these requirements during the term of probation.

In the event that Omega Protein does not comply with the terms of the plea agreement and the court's sentencing order, including the terms of probation, Omega Protein could be subject to additional criminal penalties or prosecution (including for the matters covered and resolved by the plea agreement). In addition, if Omega Protein fails to maintain compliance with the Clean Water Act or other similar environmental regulatory requirements in the future, Omega Protein could become subject to additional criminal or civil liability in connection with any such non-compliance. Omega Protein could also experience increased compliance costs, or alterations to the conduct of its normal course operations, in connection with these matters. Any of the foregoing could result in a material adverse effect on the Company's business, reputation, results of operation and financial condition.

In addition, the convictions under the Clean Water Act will adversely affect the Company's ability to secure government contracts with the United States, and secure future loans under the NFMS Title XI loan program in connection with the affected facility. The subsidiary has received notice from the E.P.A. that it is ineligible, as a result of the convictions under the Clean Water Act, for receipt of government contracts, loans or benefits if any part of the work will be performed, or the loan collateral will be located, at the facility where the offense occurred.

24.    The above statements identified in ¶¶17-23 were materially false and/or misleading, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.   Specifically, Defendants failed to disclose: (1) that Omega's subsidiary was potentially not in compliance with its probation terms; (2) that the Company was not properly protecting whistleblower employees; (3) that, as a result of the foregoing, the

Company was vulnerable to an SEC investigation and potential civil and criminal liability; and (4) that, as a result of the foregoing, Defendants' statements about Omega's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## Disclosures at the End of the Class Period

25.     On March 1, 2017, the Company disclosed that in December 2016, it received a subpoena from the SEC requesting information in connection with an investigation relating to a Company subsidiary's compliance with its probation terms and the Company's protection of whistleblower employees.  In whole, the Company stated:

> **The Company has received a subpoena from the SEC requesting information relating to a Company subsidiary's compliance with probation terms and the Company's protection of whistleblower employees.** In December 2016, the Company received a subpoena from the SEC requesting information in connection with an investigation relating to a Company subsidiary's compliance with its probation terms and the Company's protection of whistleblower employees. The Company is in the process of producing responsive documents to the SEC. The Company cannot predict the outcome of the investigation or the effect of the findings of the investigation on the Company, but it is possible that the foregoing matter could result in a material adverse effect on the Company's business, reputation, results of operation and financial condition.

26.     On this news, the price of Omega common stock fell $6.25 per share, or 23.8%, to close at $20.00 per share on March 2, 2017, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

27.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that acquired Omega's securities between June 4, 2013, and March 1, 2017, inclusive, and who were damaged thereby (the "Class").   Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

28.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Omega's common stock actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can

only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Omega shares were traded publicly during the Class Period on the NYSE. As of February 24, 2017, Omega had 22,415,851 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Omega or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

29.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

30.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

31.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Omega; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

32.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

33.     The market for Omega's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Omega's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Omega's securities relying upon the integrity of the market price of the Company's securities and market information relating to Omega, and have been damaged thereby.

34.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Omega's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Omega's business, operations, and prospects as alleged herein.

35.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Omega's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

**LOSS CAUSATION**

36.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

37.     During the Class Period, Plaintiff and the Class purchased Omega's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

**SCIENTER ALLEGATIONS**

38.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Omega, their control over, and/or receipt and/or modification of Omega's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Omega, participated in the fraudulent scheme alleged herein.

**APPLICABILITY OF PRESUMPTION OF RELIANCE**
**(FRAUD-ON-THE-MARKET DOCTRINE)**

39.     The market for Omega's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Omega's securities traded at artificially inflated prices during the Class Period.  On January 26, 2017, the Company's stock price closed at a Class Period high of $26.55 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Omega's securities and market information relating to Omega, and have been damaged thereby.

40.     During the Class Period, the artificial inflation of Omega's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Omega's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Omega and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

41.     At all relevant times, the market for Omega's securities was an efficient market for the following reasons, among others:

(a)     Omega stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Omega filed periodic public reports with the SEC and/or the NYSE;

(c)     Omega regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Omega was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

42.     As a result of the foregoing, the market for Omega's securities promptly digested current information regarding Omega from all publicly available sources and reflected such information in Omega's stock price. Under these circumstances, all purchasers of Omega's

securities during the Class Period suffered similar injury through their purchase of Omega's securities at artificially inflated prices and a presumption of reliance applies.

43.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

44.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Omega who knew that the statement was false when made.

## FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

45.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

46.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Omega's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

47.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Omega's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

48.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Omega's financial well-being and prospects, as specified herein.

49.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Omega's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Omega and its business

operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

50.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

51.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Omega's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

52.     As a result of the dissemination of the materially false and/or misleading

information and/or failure to disclose material facts, as set forth above, the market price of Omega's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Omega's securities during the Class Period at artificially high prices and were damaged thereby.

53.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Omega was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Omega securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

54.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

55.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### SECOND CLAIM
### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

56.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

57.     Individual Defendants acted as controlling persons of Omega within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's

operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

58.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

59.     As set forth above, Omega and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  March 2, 2017                    **GLANCY PRONGAY & MURRAY LLP**


                                         By: _s/ Lesley F. Portnoy_
                                         Lesley F. Portnoy (LP-1941)
                                         122 East 42nd Street, Suite 2920
                                         New York, New York 10168
                                         Telephone: (212) 682-5340
                                         Facsimile: (212) 884-0988
                                         lportnoy@glancylaw.com

                                         Lionel Z. Glancy
                                         Robert V. Prongay
                                         Casey E. Sadler
                                         Charles H. Linehan
                                         1925 Century Park East, Suite 2100
                                         Los Angeles, CA 90067
                                         Telephone:  (310) 201-9150
                                         Facsimile:   (310) 201-9160

                                         *Attorneys for Plaintiff*

## SWORN CERTIFICATION OF PLAINTIFF

## OMEGA PROTEIN CORPORATION SECURITIES LITIGATION

I, Kevin Malone, individually, and/or in my capacity as trustee and/or principal for accounts   listed on Schedule A, certify that:

1.  I have reviewed the Complaint and authorize its filing and/or the filing of a Lead Plaintiff motion on my behalf.

2.  I did not purchase **OMEGA PROTEIN CORPORATION,** the security that is the subject of this action, at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.  I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.  My transactions in **OMEGA PROTEIN CORPORATION** during the Class Period set forth in the Complaint are as follows:

    (See attached transactions)

5.  I have not served as a representative party on behalf of a class under this title during the last three years, except for the following:

6.  I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

3/2/2017
_____
Date

DocuSigned by:

*Kevin Malone*
094F2E0D41E7465...
_____
Kevin Malone

**Kevin Malone's Transactions in**
**Omega Protein Corp. (OME)**

| Date | Transaction Type | Quantity | Unit Price |
|------|------------------|----------|------------|
| 08/04/2016 | Bought | 200 | $25.0000 |